# 25-1093-cr

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

EUGENE WILLIAM AUSTIN, JR.,

*Defendant-Appellant.*

*On Appeal from the United States District Court for the Southern District of New York*

## BRIEF FOR DEFENDANT-APPELLANT

PETER J. TOMAO, ESQ.
*Attorneys for Defendant-Appellant*
600 Old Country Road, Suite 328
Garden City, New York 11530
516-877-7015

PHP (212) 719-0990
appeals@phpny.com

# `TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | iv |
| PRELIMINARY STATEMENT | 1 |
| JURISDICTIONAL STATEMENT | 2 |
| STATEMENT OF ISSUES PRESENTED FOR REVIEW | 2 |
| STATEMENT OF THE CASE | 2 |
| A. FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW | 3 |
| 1. Mr. Austin's Experience with Marketing and Finance Companies | 3 |
| 2. Small Cap Nation | 4 |
| 3. Mr. Austin's Experience with Cryptocurrency | 5 |
| 4. Mr. Austin Attempted to Rectify the Messes Caused by his Son, Brandon | 5 |
| B. PROCEDURAL HISTORY | 8 |
| 1. The Complaint | 8 |
| 2. The District Judge Based his Opinions on Two Related Cases | 9 |
| a. In One Case, Brandon Austin Pled Guilty and Was Sentenced to a Money Laundering Conspiracy | 10 |
| b. In a Second Case, Charles Riley Constant Pled Guilty and Was Sentenced in Connection with | 10 |

Transporting Money Stolen by Brandon Austin

3. The Indictment Charged Three Conspiracy Counts 12

4. Prior to Trial Mr. Austin Objected to the Government's Offer of Evidence of Uncharged Act 13

5. The Trial 13

6. Following the Jury Verdict the Lower Court Modified Mr. Austin's Bail Conditions Which Resulted in his Incarceration 14

7. PSR and Objections 14

8. Court Proceedings Prior to Sentencing 16

9. Sentencing 19

SUMMARY OF ARGUMENT 21

ARGUMENT 21

POINT I 21

THE LOWER COURT ERRED BY ADMITTING OVER MR. AUSTIN'S OBJECTIONS EVIDENCE THAT HE PARTICIPATED IN OTHER FRAUDULENT SCHEMES

A. STANDARD OF REVIEW 22

B. THE LOWER COURT'S RULINGS RESULTED IN UNFAIR PREJUDICE TO MR. AUSTIN 24

C. BASED ON THIS ERROR, THIS COURT SHOULD REVERSE THE JUDGMENT AND REMAND THE CASE FOR A NEW TRIAL 25

POINT II 25

THE LOWER COURT ERRED IN SENTENCING MR. AUSTIN

A. THE LOWER COURT'S PROCEDURAL DECISIONS IN SENTENCING DENIED MR. AUSTIN A FAIR SENTENCING 27

1. Judge Castel Erred by Failing to Recuse Himself from Sentencing Mr. Austin 27

2. The Lower Court Erred by Failing to Relieve Mr. Austin's Trial Counsel for Sentencing 31

B. THE SENTENCING JUDGE ABUSED HIS DISCRETION BY SENTENCING MR. AUSTIN, A 62-YEAR-OLD MAN WITH SERIOUS HEALTH ISSUES, TO 18 YEARS IN PRISON 34

1. Standard Of Review - Abuse of Discretion 35

2. The 18-Year Sentence Was Greater than Necessary to Comply with the Purposes of the Federal Sentencing Act 36

C. AS A RESULT OF THE ERRORS IN SENTENCING THIS COURT SHOULD REVERSE THE JUDGMENT AND REMAND THE CASE FOR RESENTENCING BEFORE A DIFFERENT JUDGE 43

CONCLUSION 44

CERTIFICATE OF COMPLIANCE 45

# TABLE OF AUTHORITIES


| CASES | Page |
|---|---|
| *Anders v. California*, 386 U.S. 738, 743 (1967) | 32 |
| *Gall v. United States*, 552 U.S. 38 (2007) | 35 |
| *Glover v. United States,* 531 U.S. 198 (2001) | 31 |
| *Gonzalez v. United States*, 722 F.3d 118 (2d Cir. 2013) | 31 |
| *Ligon v. City of New York*, 736 F.3d 118 (2d Cir. 2013), vacated in part on other grounds, 743 F.3d 362 (2d Cir. 2014) | 28 |
| *Liteky v. United States*, 510 U.S. 540, 555 (1994) | 28 |
| *McKee v. Harris*, 649 F.2d 927 (2d Cir. 1981) | 32 |
| *Strickland v. Washington*, 466 U.S. 668 (1984) | 32 |
| *United States v. Abdulrahman El Bahnasawy*, 813 F. App'x 721 (2d Cir. 2020) | 32 |
| *United States v. Amico*, 486 F.3d 764 (2d Cir. 2007) | 28 |
| *United States v. Brandon Austin*, Docket 23 CR 199 | 10, 29 |
| *United States v. Brinkworth*, 68 F.3d 633 (2d Cir. 1995) | 29 |
| *United States v. Brooks*, 889 F.3d 95 (2d Cir. 2018) | 35 |
| *United States v. Carlton*, 534 F.3d 97 (2d Cir. 2008) | 27 |

*United States v. Cavera*, 26
550 F.3d 180 (2d Cir. 2008)
*United States v. Chantal*, 29
902 F.2d 1018 (1st Cir. 1990)
*United States v. Constant*, 11
Docket 23-cr-379 (SDNY, 2024)
*United States v. Coonan*, 23
938 F.2d 1553 (2d Cir. 1991)
*United States v. Cossey*, 43
632 F.3d 82 (2d Cir. 2011)
*United States v. Cronic*, 31
466 U.S. 648 (1984)
*United States v. Curley*, 22
639 F.3d 50 (2d Cir. 2011)
*United States v. Daly*, 23
842 F.2d 1380 (2d Cir. 1988)
*United States v. Davis*, 26
82 F.4th 190 (2d Cir. 2023)
*United States v. DeRosse*, 25
No. 24-3235, 2026 U.S. App. LEXIS 294 (2d Cir. Jan. 7, 2026)
*United States v. Desnoyers*, 43
708 F.3d 378 (2d Cir. 2013)
*United States v. Dupree,* 22
706 F.3d 131 (2d Cir. 2013).
*United States v. Garcia*, 23
291 F.3d 127 (2d Cir. 2002)
*United States v. Gracesqui*, 23
730 F. App'x 25 (2d Cir. 2018)
*United States v. Guang*, 27
511 F.3d 110 (2d Cir. 2007)
*United States v. Guldi*, 35
141 F. 4th 435 (2d Cir. 2025)

*United States v. Johnson*, Nos. 21-1896 (L), 21-1923 (con), 21-2244, 2024 U.S. App. LEXIS 1617 (2d Cir. Jan. 24, 2024) 28
*United States v. Kauapirura*, No. 24-567-cr, 2025 U.S. App. LEXIS 8715 (2d Cir. Apr. 14, 2025) 28
*United States v. Lemay*, 2025 U.S. App. LEXIS 16634 (2d Cir. July 8, 2025) 22
*United States v. Massarone*, No. 24-2428-cr, 2026 U.S. App. LEXIS 546 (2d Cir. Jan. 9, 2026) 35
*United States v. McCallum*, 584 F.3d 471 (2d Cir. 2009) 23, 24
*United States v. Oberoi*, 331 F.3d 44 (2d Cir. 2003) 32
*United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978). 22
*United States v. Ortiz,* 536 F. App'x 127 (2d Cir. 2013) 23
*United States v. Perez-Frias*, 636 F.3d 39 (2d Cir. 2011) 35
*United States v. Pollok*, 139 F.4th 126 (2d Cir. 2025) 35, 36
*United States v. Polouizzi*, 564 F.3d 142 (2d Cir. 2009) 24
*United States v. Pope,* 554 F.3d 240 (2d Cir. 2009) 25
*United States v. Raniere*, Nos. 24-778 (L), 24-1285 (CON), 24-1317 (CON), 2025 U.S. App. LEXIS 28045 (2d Cir. Oct. 27, 2025) 28

28

*United States v. Rechnitz*,
75 F.4th 131 (2d Cir. 2023)

*United States v. Rigas*, 35
583 F.3d 108 (2d Cir. 2009)

*United States v. Santiago*, 26
No. 24-2615, 2026 U.S. App. LEXIS 692 (2d Cir. Jan. 12, 2026)

*United States v. Scales*, 35
No. 21-3071, 2023 U.S. App. LEXIS 33035 (2d Cir. Dec. 14, 2023)

*United States v. Scott*, 23, 24
677 F.3d 72 (2d Cir. 2012)

*United States v. Scott*, 27
614 F. App'x 567, 568 (2d Cir. 2015)

*United States v. Simeonov*, 32
252 F.3d 238 (2d Cir. 2001)

*United States v. Sokol*, 25
No. 23-6428, 2024 U.S. App. LEXIS 24617 (2d Cir. Sep. 30, 2024)

*United States v. Thompson*, 24
2025 U.S. App. LEXIS 6255 (2d Cir. Mar. 18, 2025)

**UNITED STATES CONSTITUTION**

Sixth Amendment 31

**STATUTES**

18 U.S.C. § 371 1, 9

18 U.S.C. § 1349 1, 8, 10, 11

18 U.S.C. § 1956(h) 1, 9

| | |
|---|---|
| 18 U.S.C. § 3231 | 2 |
| 18 U.S.C. § 3553(a) | 26, 36, 37, 42 |
| 18 U.S.C. § 3553(a)(2) | 36 |
| 18 U.S.C. § 3553(a)(2)(A) | 41 |
| 18 U.S.C. § 3553(a)(2)(B) | 39 |
| 18 U.S.C. § 3553(a)(2)(C) | 39, 40 |
| 18 U.S.C. § 3553(a)(6) | 42 |
| 18 U.S.C. § 3553(b)(2) | 36 |
| 18 U.S.C. § 3742(a) | 2 |
| 28 U.S.C. § 455(a) | 27, 28 |
| 28 U.S.C. § 1291 | 2 |


**FEDERAL RULES OF CRIMINAL PROCEDURE**


| | |
|---|---|
| Fed. R. Crim. P. 29 | 13 |
| Fed. R. Crim. P. 32(b)(1) | 17 |


**FEDERAL RULES OF EVIDENCE**


| | |
|---|---|
| Fed. R. Evid. 403 | 24 |
| Fed. R. Evid. 404(b) | 22, 25 |

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. §2B1.1(b)(1)(J) 15

U.S.S.G. ¶3A1.1(b)(1) 16

**OTHER AUTHORITIES**

Bloom, Judicial Bias and Financial Interest as Grounds for Disqualification of Federal Judges, 35 Case W. Res. L. Rev. 662 (1985) 29

Bureau of Just. Stat., Mortality in State and Federal Prisons and Local Jails, 2001-2019 - Statistical Tables (2021) 39

Soc. Sec. Admin., 2023 Period Life Table (2023) 38

Univ. of Oxford, *Body-mass Index and Excess Mortality Among 900,000 Adults*, 373 Lancet 1083(2009) 38

U.S. Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders (December 2017) 39

# PRELIMINARY STATEMENT

Eugene William "Hugh" Austin, Jr. ("Mr. Austin" or "Hugh Austin")[1] appeals from the judgment entered on April 23, 2025, in the Southern District of New York by United States District Judge P. Kevin Castel which principally sentenced Mr. Austin to a total of 216 months (18 years) imprisonment. (A[2] 285-293). Mr. Austin was convicted after a jury trial of three conspiracy counts, including wire fraud in violation of Title 18, United States Code, § 1349 (Count One), Money Laundering Title 18, United States Code, § 1956(h) (Count Two) and Interstate Transportation of Stolen Property Title 18, United States Code, § 371 (Count Three) (A 12-13).

Mr. Austin is currently incarcerated on that sentence.

---

1 We refer to several other members of the Austin family mentioned in this brief by their full names to distinguish them from the appellant.

2 "A" followed by numbers refers to pages in the Appendix which we are filing with this brief. "Doc." refers to documents in the district court record which were not included in the appendices. "TTr." refer to pages in the trial transcript. "GX" refers to government exhibits entered at trial. "PSR" refers to the PreSentence Report prepared on November 22, 2024, as revised on December 18, 2024. "SOR" refers to the Statement of Reasons dated April 23, 2025. We are submitting the PSR and SOR to the Court with this brief. (Note that the PSR was amended on April 30, 2025, after Mr. Austin's sentencing. The amended PSR is available on request.)

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 18 U.S.C. § 3231 which grants district courts original jurisdiction over all alleged offenses against the United States committed in that district. This case was initiated in the Southern District of New York with the filing of the sealed complaint on June 30, 2023 (A 4).

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Was Mr. Austin unfairly prejudiced by the lower court's orders allowing the government to introduce evidence of his alleged participation in uncharged frauds which were not related to the conspiracies charged in the indictment?

2. Did the lower court err in sentencing Mr. Austin?

## STATEMENT OF THE CASE

In this case the lower court permitted the government to weave a flimsy fabric of failed business deals and personal loans into a full-bodied conspiracy and then imposed a sentence which was greater than necessary to satisfy federal sentencing purposes based in large part on

the district judge's opinion of Mr. Austin reached before any evidence was offered against him.

While the indictment charged Mr. Austin with conspiring with others to fraudulently engage in cryptocurrency transactions, to provide marketing services to technology start-up companies, and to incur loans by falsely promising to quickly pay back loans with high interest rates, the lower court allowed the government to expand the evidence presented to the jury to include other acts such as failing to pay individuals hired to work for his companies, using investors' credit cards without authorization, and failing to pay hotel bills and office rental bills.

## A. FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW

The facts underlying the charges in this case involved a series of transactions beginning in 2017 and continuing through 2021, involving Mr. Austin and his son, Brandon Austin.

### 1. Mr. Austin's Experience with Marketing and Finance Companies

Prior to the events underlying the charges in this case, Mr. Austin had more than 30 years' experience in marketing and advertising

financial products. Following his graduation from college in 1986, Mr. Austin worked for various advertising businesses, and later formed his own company, "KZS Austin Inc.," an advertising agency. He operated KZS Austin Inc. with a business partner from 1997 until they sold it in 2002 (PSR ¶¶105, 106). From 2009 to 2013, Austin was the sole owner and CEO of "Wide World of Stocks Corp.," a marketing and finance company which serviced smaller companies seeking to become public focusing on national television. (PSR ¶103).

**2. Small Cap Nation**

From 2013 to 2020, Mr. Austin along with another son, John Austin, owned and operated "Small Cap Nation Corp.," a marketing and finance company located near 86th Street and Madison Avenue in New York, NY. Kenneth Kopf assisted Mr. Austin in forming Small Cap Nation.

Small Cap Nation worked with companies that were either publicly traded on the New York Stock Exchange (NYSE) and NASDAQ, or private companies seeking to become public and acquire visibility within the investment community. Prior to the COVID-19 pandemic Mr. Austin, along with John Austin, worked full-time and

wrote scripts for and produced videos and podcasts, as well as developed other marketing materials. The business ceased operations during the COVID-19 pandemic and ultimately dissolved (PSR ¶103).

Mr. Austin invested a total of approximately $3 million in cash and stock into a new business venture which ultimately became Small Cap Nation Corp. (PSR ¶104). Ultimately Mr. Kopf invested more than $ 2 million in “Small Cap Nation” and other ventures.

### 3. Mr. Austin’s Experience with Cryptocurrency

While Mr. Austin was operating Small Cap Nation, he became involved in a series of cryptocurrency deals. After Mr. Austin stopped filming Small Cap Nation from the NYSE floor, Mr. Austin turned his efforts to cryptocurrency deals, as well as assisting other business to obtain investors. Many of Mr. Austin’s efforts along these lines were unsuccessful.

### 4. Mr. Austin Attempted to Rectify the Messes Caused by his Son, Brandon

At the same time Hugh Austin operated Small Cap Nation and entered the cryptocurrency market, his son, Brandon Austin, also started dealing in cryptocurrency. Unfortunately, Brandon Austin developed substance abuse issues. Brandon took money from numerous

people promising to provide cryptocurrency, which he never did. Several of these people turned to Hugh Austin to solve the problem and then blamed him for failing to do so.

The record clearly showed in some cases, Mr. Austin was unaware of Brandon Austin's deals until Brandon's victim contacted him. For example, GX 139 shows an email between Tristan Chaudhry and Brandon Austin in which Hugh Austin was not a participant. Although when Mr. Chaudhry testified, he kept saying "they" implicating Hugh in the underlying fraud, but he was evasive about who was on that call. All of his emails were with Brandon. Hugh Austin didn't know anything about this transaction until Mr. Chaudhry contacted him for help in getting repaid (TTr. 52).

Similarly, the email record for the deal involving Debra McCann clearly shows that she dealt with Brandon, not Hugh (GX 1501, 1502, 1503, 1505, and 1506, TTr. 187). Again, Ms. McCann's testimony showed Hugh Austin tried to clean up Brandon's mess. Hugh even agreed that Ms. McCann could take Hugh's commission from the "Greentech project" to recoup her losses from the bitcoin deal (TTr. 191).

In another case, Raymond Cawaling entered into a deal with Brandon. GX101 is an email from Brandon, not Hugh. Brandon sent fake wires to Mr. Cawaling in April. (TTr. 205, GX 1601 and 1602). Mr. Cawaling testified that after Brandon stopped responding, Hugh tried to get Mr. Cawaling repaid, (TTr. 229). Eventually, Hugh sent him $3,000 (TTr. 201).

Unfortunately, Hugh Austin was unable to totally clean up the mess Brandon caused. Some of Brandon's victims acknowledged Hugh's efforts. For example, on February 15, 2022, John Trabert sent a text message to Hugh Austin that he appreciated the efforts Hugh Austin was making to try to fix the situation (TTr. 659). In that text message Mr. Trabert acknowledged Hugh Austin's efforts and said:

> You have a full plate, and I just wanted to take the time and thank you for all your hard work and efforts. Thank you always for always taking my call, and may God continue to always bless you and your family, John (GX 2401 at 96).

In another instance, Brandon Austin arranged for an attorney named Dean Mastrangelo to act as the paymaster for a deal. He arranged for the transfer of $770,000 into his account from two home equity loan accounts into Mr. Mastrangelo's escrow account (TTr. 556). These wire transfers were later determined to be fraudulent. Mr.

Mastrangelo testified that prior to receiving those transfers he only spoke and exchanged emails with Brandon Austin (TTr. 557). He testified that he did not speak with Hugh Austin until after he received notice that the funds had been obtained (TTr. 557-558). Mr. Mastrangelo testified that when he finally spoke with Hugh Austin, "He seemed surprised and he seemed angry" (TTr. 558). He further testified that Hugh Austin became involved in an attempt to rectify Brandon Austin's defalcation. After he spoke with Hugh Austin, he testified he received money to help cover the losses caused by Brandon (TTr. 558-559).

In these cases, Hugh Austin was not part of any conspiracy. He is trying to undo the damage Brandon caused. He just wanted to correct the problem. To the extent Hugh Austin got involved with Brandon Austin's messes, it was to clean them up but he just ran out of time.

## B. PROCEDURAL HISTORY

### 1. The Complaint

On June 30, 2023, the government filed a sealed complaint charging Hugh Austin with three conspiracies, including wire fraud in violation of Title 18, United States Code, § 1349 (Count One), Money

Laundering in violation of Title 18, United States Code, § 1956(h) (Count Two) and Interstate Transportation of Stolen Property in violation of Title 18, United States Code, § 371 (Count Three), all in the period "from at least approximately 2017 through 2021" (A 1, 22-35). While the Complaint did not charge Brandon Austin with an offense, it named him as a participant in the charged schemes (A 25-35).

Following Hugh Austin's arrest on July 5, 2023, United States Magistrate Judge Jennifer E. Willis arraigned him on the same day and released him on a $1,000,000 personal recognizance bond co-signed by two sureties and secured by $100,000 cash or property (A 42-84). On August 9, 2023, U.S. Magistrate Judge Gabriel W. Gorenstein eliminated the $100,000 security requirement and required a third co-signer (A 5). Mr. Austin remained free on that bond until his conviction following the jury trial in this case.

### 2. The District Judge Based his Opinions on Two Related Cases

As we discuss below, Judge Castel formed his opinion about Mr. Austin based on two proceedings in which Mr. Austin was not a party but which were considered related.

**a. In One Case, Brandon Austin Pled Guilty and Was Sentenced to a Money Laundering Conspiracy**

On April 13, 2023, before the government filed the complaint against Hugh Austin, Brandon Austin pleaded guilty before Judge Castel to a felony information which charged him with conspiracy to commit money laundering in violation of 18 U.S.C. § 1349. *United States v. Brandon Austin*, Docket 23 CR 199. While Hugh Austin was not charged in this felony information, the PSR indicated that this was a related case (PSR Page 2). On May 29, 2024, Judge Castel sentenced Brandon Austin to 48 months' imprisonment to be followed by three years' supervised release, and he was ordered to pay restitution in the amount of $3,434,450 (A 132-139). As discussed below, during that sentencing proceeding, Judge Castel revealed his opinion that Hugh Austin was the mastermind of the conspiracy.

**b. In a Second Case, Charles Riley Constant Pled Guilty and Was Sentenced in Connection with Transporting Money Stolen by Brandon Austin**

In the second case designated as a related case in the PSR, Charles Riley Constant pleaded guilty on July 18, 2023, before Judge Castel to felony information which charged him with a money

laundering conspiracy in violation of 18 U.S.C. § 1349. *United States v. Constant*, 23 CR 379 (PSR Page 2).

According to the PSR in the instant case:

> in approximately July 2020, Eugene Austin, Brandon Austin, and [another] individual[] agreed to purchase bitcoin with more than $1 million in funds sent directly from the Small Business Administration (SBA) Economic Injury Disaster Loan (EIDL) program. The funds represented EIDL loan proceeds that the SBA wire transferred to an account controlled by Charles Constant based on seven applications purportedly submitted by individuals who owned farms, all of whom were in fact victims of identity theft. The applications to the SBA were all fraudulent. In early August 2020, Eugene Austin and Brandon Austin were both informed by Constant, the broker handling the conversion of the funds from USD to bitcoin, that the SBA loans were going to be reported as fraud because the correct paperwork could not be obtained. However, EUGENE AUSTIN and Brandon Austin continued to direct funds from this fraud to their family members and associates. (PSR ¶49).

According to the government, Mr. Constant caused in stolen funds to be transported in interstate commerce (PSR ¶ 56). Mr. Constant dealt with Brandon Austin (Transcript of *United States v. Constant*, docket 23-cr-379, dated April 25, 2024 ("Constant Sentencing Transcript") at 9) to transfer funds which Brandon Austin and his associates had obtained from fraudulent SBA loans (id. at 6).

This scheme apparently resulted in a loss to the SBA totaling $1,049,000 (PSR ¶ 57).[3]

On April 25, 2024, Constant was sentenced to 14 months' imprisonment to be followed by three years' supervised release, and he was ordered to pay restitution in the amount of $339,644 (PSR ¶9, Constant Sentencing Transcript at 22).

Hugh Austin's attorneys advised the probation department that he had "no knowledge or involvement" in this scheme (A 218). The SBA fraud was not charged in Complaint (A 22-35) or the indictment in this case (A 36-41).

### 3. The Indictment Charged Three Conspiracy Counts

On October 4, 2023, a grand jury in the Southern District of New York returned the indictment in this case charging Mr. Austin with the same three counts of conspiracy as in the Complaint (A 6). The indictment did not name either Brandon Austin or Mr. Constant (A 36-41).

[3] The PSR indicates that a Victim with the address with the SBA's address 409 3rd Street, SW, Washington, DC had a loss of $1,049,000.

#### 4. Prior to Trial Mr. Austin Objected to the Government's Offer of Evidence of Uncharged Acts

Prior to trial Mr. Austin objected to the government's offer of evidence relating to uncharged acts including:

- his failure to file tax returns from 2017 to 2021
- his failure to pay child support
- disgruntled clients and former employees,

and other alleged historical uncharged acts, some of which occurred in the early 1990's. Judge Castel denied these motions at a pre-trial conference on September 11, 2024 (A 141-178).

#### 5. The Trial

Trial began on September 17, 2024, and continued to September 24, 2024 (A 12-13). At trial, Mr. Austin was represented by two lawyers appointed pursuant to the Criminal Justice Act, David K. Bertan and Jacob Mitchell (*Id.*).

Following this colloquy, Mr. Austin made a Rule 29 Motion which Judge Castel denied (TTr. 995).

Hours after hearing closing arguments and the judge's instructions, the jury returned their verdict finding Mr. Austin guilty on all counts (TTr. 1112).

### 6. Following the Jury Verdict the Lower Court Modified Mr. Austin's Bail Conditions Which Resulted in his Incarceration

Following the jury's verdict, the government initially did not ask to remand the defendant and agreed that his bail conditions be continued until the date of sentencing (TTr. 1118). However, the government then changed its position and asked that the bond be fully secured with a million dollars of property, along with several other conditions (TTr. 1121).

The lower court ordered that bail be modified such that the bond is fully secured and scheduled a further bail hearing on October 1, 2024 (TTr. 1122) The lower court also scheduled sentencing for February 20, 2025 (*Id.*).

At the bail hearing on October 1, 2024, the lower court reduced the security to $650,000 and, despite Mr. Austn's compliance with pretrial release conditions, ordered Mr. Austin remanded until security is posted (A 192). Mr. Austin was never able to post the required security and has remained incarcerated.

### 7. PSR and Objections

The Probation Department prepared a Pre-Sentence Report and issued the initial disclosure on November 22, 2024 (PSR page 1).

Defense counsel objected to portions of the initial PSR in their email to the Probation Department on December 6, 2024, and their letter dated December 12, 2024. The defense objections were in two categories: First, the defense objected to the references to conduct relating to purported victims[4]. While these individuals testified at trial, the defense noted that the jury did not make specific findings related to them. The Probation Department deferred to the government to provide proof to the sentencing court (PSR page 36).

In the second category, the defense objected to the loss calculation. While the Probation Department found that the total loss was $13,567,354, the defense maintained that the loss should be reduced to $9,267,354. The defense based this reduction on two purported victims, Victim 1 and Victim 21. The defense argued that Victim 1 was, in fact, a knowing investor and Hugh Austin's longtime friend, while Victim 21 was also an investor but was bilked by another individual. The reduction would have decreased the total offense level by two levels under U.S.S.G. §2B1.1(b)(1)(J). (PSR pages 36-37).

---

[4] The PSR identified the purported victims by numbers which did not exactly correspond to numbers given to them in other contexts.

The defense also objected to classifying Victim 1 as an "elderly victim." The defense noted that Victim 1 "is adamantly opposed to his classification as a victim." (A 212). This would have reduced the total offense level by two levels added under U.S.S.G. §3A1.1(b)(1) (PSR pages 36-37).

The Probation Department also rejected these objections again deferring to the government (PSR pages 37).

The Probation Department issued the revised Final Presentence Report on December 18, 2024, along with its Sentencing Recommendation. The PSR computed the guideline imprisonment range as 292 to 365 months based upon a total offense level of 40 and a Criminal History Category of I (PSR ¶ 115). The recommended sentence was 120 months custody and three years supervised release with conditions on each count to run concurrently, total restitution of $13,357,564 and total special assessment of $300 (PSR page 38).

**8. Court Proceedings Prior to Sentencing**

On January 13, 2025, Mr. Austin asked the lower court to adjourn the sentencing from February 20, 2025, until the first two weeks of April (A 16). Judge Castel denied this request (*Id.*).

By letter dated February 5, 2025, Mr. Bertan provided Judge Castel with a letter from Mr. Austin saying that he had lost confidence in Mr. Bertan and Mr. Mitchell and requested that the lower court relieve them and appoint new counsel (A 194-195). Mr. Bertan also indicated that he was "refraining" from filing the sentencing submission for Mr. Austin which was due the next day (A194).

Rather than grant this motion, on February 6, 2025, the lower court appointed an additional CJA counsel, Steven Brill (A 197). Judge Castel indicated in his order that the lower court intended to comply with the requirement of Fed. R. Crim. P. Rule 32(b)(1): "The court must impose sentence without unnecessary delay" (*id.*).

After Judge Castel entered the order appointing Mr. Brill but continuing his trial attorneys, Mr. Bertan filed the sentencing submission along with letters of support (A 198-208). As a part of his sentencing submission, Mr. Bertan attached a letter from Ken Kopf (Doc. 196-1). In it, Mr. Kopf described his thirty-year relationship with Mr. Kopf as Hugh's longtime friend and business partner. They met in 1997, when they were both in the advertising business. They formed their own company. According to Mr. Kopf, Hugh turned the

recruitment advertising part of their business into "a formidable part of the agency." Mr. Kopf recounted how Hugh's marketing and networking skills were a "huge asset". Mr. Kopf also noted that Hugh is a devoted father and friend and provided Mr. Kopf with guidance and advice on personal and professional matters. While Mr. Kopf acknowledged the situation Hugh now faces, he also knows that Hugh is a talented, dedicated good person. Mr. Kopf asked the sentencing judge consider his words in deciding Hugh's sentence (Doc. 96-1 @ 13-17). Mr. Kopf described to the sentencing court his frustration with being categorized as a "victim" with who Mr. Austin's bail conditions prohibited contact. He stated unequivocally that he did not consider himself to be a victim because he made his decisions to invest with Hugh on his own forty plus years' experience in marketing and investing (Doc. 96-1 @ 15).

Judge Castel adjourned the sentencing date at Mr. Brill's request from February 20th to March 13, and then to March 19 to allow the government additional time to file its sentencing submission (Doc. 97-104).

Mr. Brill filed a letter on March 8, 2025, reaffirming the objections Mr. Bertan had made to the PSR and conveying the parties' request for

a *Fatico* hearing (A 209-219). On March 11, 2025, the lower court vacated the sentencing date and ordered a *Fatico* hearing to be held on April 22, 2025 (A 2).

The parties resolved the factual disputes without a *Fatico* hearing (A 220-221). The government made its sentencing submission on April 7, 2025 (Doc. 112). Mr. Brill filed two sentencing submissions for Mr. Austin on April 10 and April 22, 2025 (Doc. 114 and 115). The government submitted a proposed order of restitution and a preliminary order of forfeiture on April 22, 2025 (Doc. 116).

**9. Sentencing**

Judge Castel conducted the sentencing proceeding on April 23, 2025 (A 222-284). Mr. Brill appeared for Mr. Austin along with Mr. Bertan and Mr. Mitchell (*Id.*).

The parties advised the sentencing court that they agreed that the amount of restitution should be reduced from $13,357,564, as proposed in the PSR (PSR ¶ 125) to $12,662,564 (A 228), and to several other modifications to the PSR. The parties agreed that individuals designated as "victims" 4, 5, 7, 13, and 27 be redesignated "employees," that the $45,000 owed to Victim 14 was actually "an outstanding

referral fee" and that "Victim 11" (PSR ¶ 26) be redesignated "Individual 11" (A 225-227). The government agreed that "instead of a 20-level increase for the loss amount being between nine and a half million and 25 million, it should be an 18-level increase based on the loss amount of three and a half to nine and a half million" (A 229). With these corrections, the total offense level was 39 and criminal history Category was I resulting in the guideline sentencing range of 262 to 327 months (A 232).

The sentencing court adopted the finding in the PSR as modified by the parties and found that the guideline sentencing range to be 262 to 327 months based on total offense level 39 and CHC I (A 232).

After hearing from the government, some victims and their family members, Mr. Brill and Mr. Austin, the sentencing court granted a variance and sentenced Mr. Austin to 216 months in prison[5], three years supervised release and $300 special assessment. The lower court also ordered Mr. Austin to pay $12,662,564 restitution, joint and several

---

[5] Since the sentence exceeded the statutory caps on some counts, the lower court sentenced Mr. Austin to 176 months on Count 1 to run consecutive to concurrent sentences of 40 months on Counts 2 and 3 (A 278).

with the restitution orders entered against Mr. Constant and Brandon Austin (A 277-282). The lower court also entered $6,062,564 forfeiture order as a money judgment (A 282).

This appeal follows.

## SUMMARY OF ARGUMENT

Mr. Austin was unfairly prejudiced by the lower court's orders allowing the government to introduce other act evidence (Point I). As a result, the Court should remand this case for a new trial (Point I C).

The lower court committed procedural and substantive errors in sentencing Mr. Austin requiring this Court vacate the judgment and remand this case for resentencing before a different judge (Point II).

## ARGUMENT

### POINT I

### THE LOWER COURT ERRED BY ADMITTING OVER MR. AUSTIN'S OBJECTIONS EVIDENCE THAT HE PARTICIPATED IN OTHER FRAUDULENT SCHEMES

Over Mr. Austin's objections the lower court erroneously admitted evidence that Mr. Austin obtained money from other people through a series of fraudulent schemes. Notably, Mr. Austin was not convicted of engaging in these schemes. Rather he was charged with conspiring with

others, namely Brandon Austin, to commit various crimes. Since Brandon Austin did not play any role in these other acts, the government's argument that those acts shed light on Hugh Austin's specific intent to enter into the charged conspiracy with Brandon Austin simply defies logic. The lower court's decisions resulted in a misleading, one-sided presentation which unfairly prejudiced Hugh.

## A. STANDARD OF REVIEW

This Court reviews challenges to a district court's evidentiary rulings deferentially, reversing only for abuse of discretion. *United States v. Lemay*, 2025 U.S. App. LEXIS 16634, at *5 (2d Cir. July 8, 2025); citing *United States v. Dupree*, 706 F.3d 131, 135 (2d Cir. 2013).

However, this Court's "inclusionary approach" to FRE 404(b) does not mean that all prior or subsequent bad acts or offenses are presumptively admissible. *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011). To the contrary, the text of FRE 404(b) permits admittance of other act evidence only if it serves a purpose other than to prove propensity or bad character. *Id.* Ultimately, "caution and judgment are called for" when dealing with other act evidence. *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978).

While this Court has held that a trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment, to demonstrate "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) citing *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988). This Court has reversed convictions where the other act lacked sufficient similarity to the charged crime, emphasizing that without a close factual nexus, the evidence relies entirely on a forbidden propensity inference. *See United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002). In *United States v. McCallum,* 584 F.3d 471, 477 (2d Cir. 2009), this Court condemned the admission of prior bad acts as "propensity evidence in sheep's clothing." As this Court noted in *McCallum*, "this inclusionary approach does not invite the government to offer, carte blanche, any prior act of the defendant in the same category of crime." 584 F.3d 475 citing *Garcia*, 291 F.3d at 137. *See United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012); *United States v. Ortiz*, 536 F. App'x 127, 128 (2d Cir. 2013). In *United States v.*

*Gracesqui*, 730 F. App'x 25, 29 (2d Cir. 2018), the panel reiterated that "We have, however, emphasized that this inclusionary rule is not a carte blanche to admit prejudicial extrinsic act evidence when it is offered to prove propensity." (quoting *Scott*, 677 F.3d at 79).

The admission of such evidence is still subject to the balancing test in FRE 403. Under FRE 403 the trial judge must determine whether the probative value of such evidence is "substantially outweighed" by the risk of "unfair prejudice" among other factors. *McCallum*, 584 F.3d at 475. This Court reviews a district court's balancing under Rule 403 for abuse of discretion. *United States v. Thompson*, 2025 U.S. App. LEXIS 6255, at *3 (summary order) (2d Cir. Mar. 18, 2025), citing *United States v. Polouizzi*, 564 F.3d 142, 152 (2d Cir. 2009).

## B. THE LOWER COURT'S RULINGS RESULTED IN UNFAIR PREJUDICE TO MR. AUSTIN

By admitting evidence of the …, the trial judge created a record of a one-sided version of the facts, which unfairly prejudiced Mr. Austin. The other act evidence presented that Mr. Austin must have conspired as charged in the indictment regarding the cryptocurrency-based Ponzi schemes because he was a serial fraudster who cheated a number of other

people. This is precisely the type of propensity evidence which FRE 404(b) prohibits.

### C. BASED ON THIS ERROR, THIS COURT SHOULD REVERSE THE JUDGMENT AND REMAND THE CASE FOR A NEW TRIAL

Based on the foregoing, this Court should reverse the judgment in this case and remand it to the district court for a new trial.

## POINT II

## THE LOWER COURT ERRED IN SENTENCING MR. AUSTIN

The lower court erred in sentencing Mr. Austin to 216 months (18 years) imprisonment. Judge Castel rejected the Probation Department's recommendation of 120 months (10 years) sentence[6] (A 278). The resulting sentence was greater than necessary to satisfy the purposes of sentencing. The 18-year sentence imposed on Mr. Austin eclipsed those

---

[6] We recognize that the district court was not required to follow either the government's or the Probation Office's recommendations. See, e.g., *United States v. Sokol*, No. 23-6428, 2024 U.S. App. LEXIS 24617, at *8 (2d Cir. Sep. 30, 2024). As this Court recently noted, "The mere fact that the defense or the Probation Office recommended a lower sentence does not render the different conclusion of the district court an abuse of discretion." *United States v. DeRosse*, No. 24-3235, 2026 U.S. App. LEXIS 294, at *8 (2d Cir. Jan. 7, 2026) citing *United States v. Pope*, 554 F.3d 240, 247 (2d Cir. 2009).

imposed in the related cases and Brandon Austin. Brandon was sentenced to 4 ½ years, while Constant was sentenced to 14 months. In this case, the Court should reverse the lower court's ruling and remand the case for resentencing before a different judge.

This Court reviews a district court's sentence for reasonableness applying a "deferential abuse-of-discretion standard". This standard of review applies "both to the procedures used to arrive at the sentence (procedural reasonableness) and to the length of the sentence (substantive reasonableness)." *United States v. Santiago*, No. 24-2615, 2026 U.S. App. LEXIS 692, at *2 (2d Cir. Jan. 12, 2026)(summary order) quoting United *States v. Davis*, 82 F.4th 190, 195-196 (2d Cir. 2023). Under this standard, this Court considers first whether the district court committed procedural error. A district court errs procedurally if it does not consider the 18 U.S.C. § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact. A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc), *United States v.*

*Guang*, 511 F.3d 110, 122 (2d Cir. 2007), *United States v. Scott*, 614 F. App'x 567, 568 (2d Cir. 2015) (Summary Order).

## A. THE LOWER COURT'S PROCEDURAL DECISIONS IN SENTENCING DENIED MR. AUSTIN A FAIR SENTENCING

The lower court made two critical procedural errors regarding Mr. Austin sentencing: first, the lower court failed to recuse himself after making an opinion of Mr. Austin's role in defense based on opinions drawn from other proceedings and, second, the lower court denied Mr. Austin's request to relieve his trial attorneys from representing him at sentencing.

### 1. Judge Castel Erred by Failing to Recuse Himself from Sentencing Mr. Austin

The sentencing judge showed bias against Mr. Austin requiring him to recuse himself as required by 28 U.S.C. § 455(a). Under that statute, a district judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The governing "standard is objective reasonableness — whether an objective, disinterested observer fully informed of the underlying facts, would entertain significant doubt that justice would be done absent recusal." *United States v. Carlton*, 534 F.3d 97, 100 (2d Cir.

2008). *See United States v. Rechnitz*, 75 F.4th 131, 142 (2d Cir. 2023). *See also United States v. Raniere*, Nos. 24-778 (L), 24-1285 (CON), 24-1317 (CON), 2025 U.S. App. LEXIS 28045, at *11-12 (2d Cir. Oct. 27, 2025); *United States v. Kauapirura*, No. 24-567-cr, 2025 U.S. App. LEXIS 8715, at *5 (2d Cir. Apr. 14, 2025); *United States v. Johnson*, Nos. 21-1896 (L), 21-1923 (con), 21-2244, 2024 U.S. App. LEXIS 1617, at *17 (2d Cir. Jan. 24, 2024). This inquiry on appeal "deals exclusively with appearances." *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007). While we recognize that "judicial remarks" that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases" do not ordinarily support a bias or partiality challenge, *Liteky v. United States*, 510 U.S. 540, 555 (1994), recusal is required, where, as here, the judge shows the "deep-seated antagonism" that makes "fair judgment impossible". *Id.* This Court has held that in close cases, "the balance tips in favor of recusal." *Ligon v. City of New York*, 736 F.3d 118, 124 (2d Cir. 2013), vacated in part on other grounds, 743 F.3d 362 (2d Cir. 2014). *See Rechnitz*, 75 F.4th at 143.

While Mr. Austin did not ask Judge Castel to recuse himself, the sentencing judge erred by not doing so. Courts have held that § 455(a) is

automatic, mandatory and self-executing." *See United States v. Chantal*, 902 F.2d 1018, 1023 (1st Cir. 1990), citing Bloom, Judicial Bias and Financial Interest as Grounds for Disqualification of Federal Judges, 35 Case W. Res. L. Rev. 662, 670-71 (1985) (*id.* at n.11). Cf. *United States v. Brinkworth*, 68 F.3d 633, 637 (2d Cir. 1995) citing *Chantal* for another purpose.

In the instant case, a "disinterested observer" would undoubtedly entertain significant doubt about the fairness of the sentencing proceeding based on Judge Castel's reference to other, albeit related, cases which are dehors the record. Throughout Hugh Austin's sentencing, Judge Castel clearly referenced the case against Brandon Austin.

Procedurally, the cases were separate. Brandon Austin pleaded guilty to an Information in *United States v. Brandon Austin*, 23 CR 199 on April 13, 2023 (PSR ¶ 8). Hugh Austin's case began over two months later on June 30, 2023, when the government filed its complaint in this case (A4). Accordingly, when Judge Castel presided over Brandon's sentencing, he was conducting a proceeding in which Hugh Austin was

not a party and had no opportunity to contest factual assertions or test the government's narrative through the adversarial process.

At Brandon Austin's sentencing on May 28, 2024, approximately four months before Hugh Austin's trial, Judge Castel recited a detailed narrative of specific criminal conduct which he attributed to Brandon Austin "and his father" (A 120-124). For example, Judge Castel said that "The defendant [Brandon] and his father [Hugh] operated as brokers.... They recruited other individuals to source the Bitcoin" (A 121). The lower court judge further found that "In February '18, the defendant and his father induced a Japanese cryptocurrency company to conduct an interstate cryptocurrency transaction..." (A 122); that Brandon Austin "and his father... fraudulently induced a partner at a California-based investment firm to send an interstate wire transfer of approximately $5 million..." (*id.*); and that in January 2019 they "fraudulently induced" another victim to send approximately $4 million (A 123). Judge Castel concluded in sentencing Brandon Austin one of the principal factors he considered "his father's influence has been part of the motivating factors in this extensive criminal activity (A 131).

This bias permeated Hugh Austin's sentencing. A disinterested observer would have serious doubt that a jurist who had determined that a defendant was guilty before any evidence was presented could render a fair sentence.

### 2. The Lower Court Erred by Failing to Relieve Mr. Austin's Trial Counsel for Sentencing

Judge Castel also erred by denying Mr. Austin's motion to relieve his trial counsel, Messrs. Bertan and Mitchell, and appoint new counsel for sentencing (A 194). Instead, the lower court judge appointed a third attorney, Mr. Brill, in addition to trial counsel without hearing from Mr. Austin (A196). As a result, rather than having a new counsel perform an independent review of the record, the three member team reinstated the objections to the PSR made by trial counsel.

The Sixth Amendment guarantees the right to conflict-free representation at all phases of the case including sentencing. *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013), citing, among other cases, *Glover v. United States*, 531 U.S. 198, 202-04 (2001).

The Supreme Court has held that "the adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'" *United States v. Cronic*, 466

U.S. 648, 656 (1984), quoting *Anders v. California*, 386 U.S. 738, 743 (1967). *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).

This Court reviews a district court's decision on the role of counsel, such as the denial of a motion to withdraw and substitute counsel, for abuse of discretion. *See United States v. Oberoi*, 331 F.3d 44, 47 (2d Cir. 2003). *See also United States v. Simeonov*, 252 F.3d 238, 241 (2d Cir. 2001). The district court's decision is granted "considerable deference," especially when "the prosecution of the suit is likely to be disrupted by the withdrawal of counsel." *Oberoi*, 331 F.3d at 47. *United States v. Abdulrahman El Bahnasawy*, 813 F. App'x 721, 723 (2d Cir. 2020).

The lower court failed to conduct the inquiry to determine the reasons for Mr. Austin's dissatisfaction with Messrs. Bertan and Mitchell. This Court has held "It is settled that where a defendant voices a seemingly substantial complaint about counsel, the court should inquire into the reasons for dissatisfaction." *Simeonov*, 252 F.3d at 241 citing *McKee v. Harris*, 649 F.2d 927, 933 (2d Cir. 1981). While a court may rule without conducting a hearing where the reasons for dissatisfaction are known to the court, (*id.*), that was not the case here.

In his letter to the lower court, Mr. Austin stated that there had been "a complete breakdown in communication and trust has made it impossible for us to work together effectively" and "[a]t this point our differences are irreconcilable" without providing detail (A 195). However, the district court failed to inquire into the nature of the conflict.

The lower court's February 6, 2025, order implicitly recognized that there was a serious problem between Mr. Austin and his trial counsel but did not ascertain the scope of the problem (A 197).

Instead of providing an advocate, the lower court's action added a mediator to the existing attorney client relationship. Mr. Brill said as much: "your Honor made the decision to essentially assign me to enter the trial team, so to speak, when there was some disagreement between client and attorneys as to sentencing strategy and proceeding further" (A 232-233).

Had the new attorney been isolated from trial counsel, their presence at the table might have been less significant. However, they operated as a single, tainted unit. This "forced marriage" meant that the new lawyer was hamstrung by the prior team's negligence,

rendering him unable to effectively argue for a continuance or a different sentencing strategy without criticizing his own "team." This was a structural defect that bypassed the possibility of an independent, effective defense at the most critical stage of the case.

By failing to relieve trial counsel, the lower court put new counsel in the position of attempting to resolve the disputes between Mr. Austin and trial counsel, rather than focusing fully on the sentencing issues. At sentencing, Mr. Brill said that after Judge Castel added him to the defense team "I was able to speak to Mr. Austin, obviously to Mr. Bertan and Mr. Mitchell, and ultimately our interactions led to I think a lot of good discussions and resolution to what was essentially a disagreement when it came to sentencing" (A233).

### B. THE SENTENCING JUDGE ABUSED HIS DISCRETION BY SENTENCING MR. AUSTIN, A 62-YEAR-OLD MAN WITH SERIOUS HEALTH ISSUES, TO 18 YEARS IN PRISON

This Court should reverse the 216-month (18 years) sentence imposed on Mr. Austin by Judge Castel because the lower court abused its discretion. In addition to the lower court's improper reliance on information from other cases as discussed above, the 18-year sentence

was substantively unreasonable and greater than necessary to satisfy the goals of sentencing.

### 1. Standard Of Review - Abuse of Discretion

"[A]ppellate review of sentencing decisions is limited to determining whether they are 'reasonable.'" *Gall v. United States*, 552 U.S. 38, 46, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007). *See United States v. Guldi*, 141 F.4th 435, 449-50 (2d Cir. 2025).

This Court reviews a district court's sentencing determination for substantive reasonableness under the abuse of discretion standard. *See United States v. Pollok*, 139 F.4th 126, 144 (2d Cir. 2025) citing *United States v. Brooks*, 889 F.3d 95, 100 (2d Cir. 2018). *See United States v. Massarone*, No. 24-2428-cr, 2026 U.S. App. LEXIS 546, at *2 (2d Cir. Jan. 9, 2026) citing *United States v. Rigas*, 583 F.3d 108, 121 (2d Cir. 2009). This Court has noted that it is particularly "difficult to find that a below-Guidelines sentence is unreasonable." *United States v. Scales*, No. 21-3071, 2023 U.S. App. LEXIS 33035, at *14 (2d Cir. Dec. 14, 2023), citing *United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011), in this case, the sentencing court did not provide adequate reasons to support an 18-year sentence.

This Court recently reaffirmed that it continues to apply the parsimony principle. The Court said "in evaluating the substantive reasonableness of a sentence, we use as our lodestar the parsimony clause of 18 U.S.C. § 3553(a), which directs sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the factors set out in 18 U.S.C. § 3553(a)(2)". *Pollok*, 139 F.4th at 144.

### 2. The 18-Year Sentence Was Greater than Necessary to Comply with the Purposes of the Federal Sentencing Act

A sentencing judge's discretion in imposing sentence is limited by 18 U.S.C. § 3553(a) which provides "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Congress defined those purposes as "the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" 18 U.S.C. § 3553(b)(2).

Under these circumstances of this case, the 216-month (18 years) sentence imposed was substantially unreasonable. The Probation Department had recommended 120 months (ten years) (PSR page 38). As defense counsel emphasized the ten-year sentence for Mr. Austin, who was 62 years old at his sentencing and had numerous health issues, was "a very substantial sentence." Counsel said that a ten-year sentence "would in fact be a life sentence." (A 200). Upon completion of that sentence, he would have been older than his father at his death (*Id.*).

As defense counsel argued under the sentencing factors set forth in 18 U.S.C. §3553(a), a sentence below Probation's recommendation of 120 months is fair, sufficient, and not more than necessary to achieve the ends of justice to reflect the seriousness of the offense to promote respect for the law; to provide just punishment; to provide deterrence; to protect the public from further crimes of the defendant; to provide the defendant with any needed rehabilitative services; and, where appropriate, to avoid unwarranted sentencing disparity (A 205, 207).

There was no basis for the lower court to find that an additional eight years was necessary to reflect the seriousness of the offense in this

case. While the offense is extremely serious and many people suffered financial harm as a result of the conduct in this case, a sentence of up to ten years is a very serious, lengthy sentence, for a 62-year-old man with serious health issues. Given the current state of medical care in BOP facilities and Mr. Austin's family history, a 216-month sentence is essentially a death sentence. The BOP estimates that his Release Date is December 28, 2039 (https://www.bop.gov/inmateloc/ using number 66824-510, visited February 1, 2026), at which point he would be 77 years old. As Mr. Austin's counsel pointed out to the sentencing judge, BOP statistics describe the poor health care in federal jails. Several studies which analyzed BOP data show a 59-year-old inmate has the same geriatric morbidity as a 75-year-old who is not in jail. https://pmc.ncbi.nlm.nih.gov/articles/PMC10129364/.

While a 62-year-old male in the general population has a median life expectancy of 19.6 years, see Soc. Sec. Admin., 2023 Period Life Table (2023), this window is severely compressed by obesity-related mortality risks and the Bureau of Prisons' documented inability to manage geriatric comorbidities. *See* Univ. of Oxford*, Body-mass Index and Excess Mortality Among 900,000 Adults*, 373 Lancet 1083, 1084-91

(2009) (noting that even moderate obesity reduces life expectancy by three years). When adjusting the subject's physiological age to 75 to account for incarceration and obesity, the probability of surviving to the chronological age of 80 is statistically negligible, as inmates over age 55 now account for the vast majority of natural deaths in custody. *See* Bureau of Just. Stat., *Mortality in State and Federal Prisons and Local Jails, 2001-2019* - Statistical Tables (2021).

In terms of recidivism, a factor under 18 U.S.C. §3553(a)(2)(C), given Hugh's age (62), he presents extremely little risk of re-offending. The Sentencing Commission has noted that there was little likelihood that older offenders would re-offend. In their 2017 report, the Sentencing Commission found that only 13% of offenders over 65 were rearrested. *See* U.S. Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders (December 2017). When criminal history was factored into the analysis, only 11% of first-time older defendants were rearrested (*id.*).

In terms of both general and specific deterrence under 18 U.S.C. §3553(a)(2)(B), as noted above, a 120-month sentence is a very substantial sentence. Spending ten years in jail, and forfeiting millions

of dollars, would strongly deter possible other offenders from committing crimes. There is no basis supporting the lower court's finding that an additional eight years is necessary to ensure general deterrence. Similarly, there is no basis for the sentencing court to find that a sentence 96-months greater than 120 months was necessary to afford specific deterrence. Under a 120-month sentence, Mr. Austin would spend a significant portion of his remaining life behind bars. This, coupled with the recognized low percentage of recidivism for older offenders, discussed above, shows that Mr. Austin would be sufficiently deterred from any further criminal conduct by a ten-year sentence.

Nor was there any basis to find that a sentence of more than ten years in jail was necessary to adequately protect the public from any other criminal conduct by Mr. Austin pursuant to 18 U.S.C. §3553(a)(2)(C). This need is also ensured by the conditions of his supervised release which would likely continue to January 2045, when he would be more than 80 years old. Mr. Austin's felony conviction would be readily available to ensure that no one would trust him in the future. He will have no opportunities to participate in any further

fraudulent activity. In fact, he is, for all purposes, blocked from engaging in any sort of financial activity as a result of his conviction.

Nor is that any basis for the sentencing judge to have found that a greater than ten years was necessary to promote significant respect for the law under 18 U.S.C. §3553(a)(2)(A). Considering the conduct in this case, which, while admittedly serious, was strictly financial, a decade in prison is a very significant sentence for an older defendant. Mr. Austin is significantly older than the rest of the population, will likely have the health issues that come with age, and will face the harshness and vagaries of incarceration as he approaches old age.

Of course, there is no basis to find that the additional eight years imposed by Judge Castel was necessary for rehabilitation. While Mr. Austin is well-educated and has had a successful business history before the events of this case, he can certainly take advantage of BOP programs that can help him deal with life as an older person after prison. In addition, the ten-year sentence recommended by Probation would ensure that he has the time necessary to reflect on his choices and learn how to make better life choices when he is released. There is

no basis to find that an additional eight years is necessary for this purpose.

Moreover, the 18-year sentence also created significant sentencing disparity. Under 18 U.S.C. § 3553(a)(6), Congress specifically instructed sentencing judges to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The defendants in the related cases received significantly lower sentences as a result of their plea agreements. Brandon was sentenced to 4 ½ years, while Constant was sentenced to 14 months. Both of those defendants were active and involved participants in the frauds at issue.

Under these sentences, the 18-year sentence imposed by Judge Castel was clearly greater than necessary in light of 18 U.S.C. § 3553 (a) factors.

## C. AS A RESULT OF THE ERRORS IN SENTENCING THIS COURT SHOULD REVERSE THE JUDGMENT AND REMAND THE CASE FOR RESENTENCING BEFORE A DIFFERENT JUDGE

This Court should remand the case for resentencing. While this Court will generally remand the case to the same district judge after reversal for resentencing, *United States v. Desnoyers*, 708 F. 3d at 390, here the sentencing judge is likely to have substantial difficulty setting aside the erroneously held views, so the case should be remanded to a different judge. *United States v. Cossey*, 632 F.3d 82, 88 (2d Cir. 2011). Under the circumstances, remanding to a different judge would not result in judicial inefficiencies and would preserve the appearance of fairness.

In the instant case, the Court should remand this case to a different judge.

## CONCLUSION

For the reasons stated above, the judgment of conviction in this case should be vacated and remanded to the district court.

Dated: February 18, 2026
Garden City, New York

Respectfully submitted,

/s/ Peter J. Tomao
PETER J. TOMAO, ESQ. (PT6409)
Attorney for Defendant-Appellant
600 Old Country Road, Suite 328
Garden City, New York 11530
(516) 877-7015

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that the foregoing brief complies with the requirements of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. The typeface used was 14 Point Century. According to the word processing system used to prepare this brief, the number of words in the brief is 8384.

Dated: February 18, 2026
Garden City, New York

Respectfully submitted,

/s/ Peter J. Tomao
PETER J. TOMAO, ESQ. (PT6409)
Attorney for Defendant-Appellant
600 Old Country Road, Suite 328
Garden City, New York 11530
(516) 877-7015